**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FORCINE CONCRETE & CONSTRUCTION COMPANY,**<br><br>Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>**MS PARK CONSTRUCTION LLC f/k/a RESEARCH LLC, PNK HOLDINGS, LLC, ANDREY SHARKOV, MARK STILES,**<br><br>Defendants/Counterclaim Plaintiff. | **No.: 3:23-cv-02024**<br><br>**(Hon. Leo A. Latella)** |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

***A. The Subcontract.***

1. PNK P1, LLC was the owner of the property located at Humboldt Industrial Park, Lot 25B, Hazle Township, Pennsylvania 18202 (the "Property"). A true and accurate copy of the Agreement between PNK P1, LLC, as Owner, and MS Park Construction, LLC f/k/a Research, LLC, is attached hereto as Exhibit A.

2. On or about September 1, 2021, PNK P1, LLC entered into a contract with Defendant MS Park Construction, LLC f/k/a Research, LLC ("MS Park") to construct a 316,433 square-foot warehouse on the Property (the "Project"). See Exhibit A.

3. On February 10, 2022, MS Park subcontracted with Plaintiff Forcine Concrete & Construction Company ("Forcine") to install the foundations and concrete slab for $1,808,700, plus authorized add-alternates (the "Subcontract"). A true and correct copy of the Subcontract between MS Park and Forcine is attached hereto as Exhibit B.

4. The Subcontract required Forcine to pour and install a pre-engineered concrete slab system by Ductilcrete. See Exhibit B.

5. Pursuant to the Subcontract, Forcine warranted that its "Work will conform to the requirements of the Subcontract Documents and will be free from defects, except for those inherent in the quality of the Work for the Subcontract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective." See Exhibit B, § 4.6.1.

6. Forcine further warranted that it would "use its best efforts, skill, judgment, and abilities to perform its obligations and to further the interests of [MS Park]," would "perform its services in accordance with the usual and customary standards of [Forcine's] profession or business," and would "bear the full cost of

correcting [Forcine's] negligent or improper work and services." See Exhibit B, § 4.6.1.

7. Section 9.2.2 of the Subcontract sets forth the schedule for Forcine to perform its work on the Project, providing that Forcine was to achieve substantial completion of the foundation and slab work within three (3) weeks and eight (8) weeks, respectively, of receiving notice to commence Work from MS Park. See Exhibit B, § 9.2.2.

8. To receive payment under the Subcontract, Forcine was required to submit Applications for Payment to MS Park on a monthly basis: "Applications for payment shall be submitted only for Work that has already been completed by Subcontractor and shall be submitted on or before the 28th of each month for the current month. Payment shall be NET thirty (30) days, with a 5% retainage on all payments … The final payment will be made after all inspections are complete and the punch list removed." See Exhibit B, § 11.1.2.

9. Subcontract § 11.1.8.1 states that "[f]or each progress payment made prior to substantial completion of the Subcontractor's Work, the Contractor may withhold the following amounts as retainage from the payment otherwise due: 5%." See Exhibit B, § 11.1.8.1.

10. Subcontract § 11.1.8.2 states that "[a]fter 50% completion, retainage would be reduced to 2.5%." Subcontract § 11.1.8.2 contains no language

authorizing release or disbursement of retainage previously withheld. See Exhibit B, § 11.1.8.2.

11. Subcontract § 11.1.7.1 limits Payment Applications to "[t]he amount, if any, for changes in the Work that are *not in dispute* and have been *properly authorized by the Contractor*, pending a final determination by the Contractor of the cost of changes in the Subcontractor's Work, even though the Subcontract Sum has not yet been adjusted." (Emphasis added.) See Exhibit B, § 11.1.7.1.

12. Subcontract § 11.1.7.2 further provides that any Payment Application shall be reduced by, among other things, "[t]he amount, if any, for Work that remains uncorrected and for which the Contractor has previously withheld a Certificate for Payment" and "[r]etainage withheld pursuant to Section 11.1.8." See Exhibit B, § 11.1.7.2.

13. Subcontract § 11.3.1 provides that "Final Payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a Certificate for Payment covering the Subcontractor's completed Work and the Contractor has received payment from the Owner. Final payment shall be made subject to and after completion of the punch list items and approval of the Contractor, Control Inspector, Engineer, Township Inspectors and Third-Party

(including the Bank) inspectors who shall confirm that the Work has been fully performed ….” See Exhibit B, § 11.3.1.

14. Subcontract § 11.3.2 provides that “[t]he Application from Subcontractor for Final Payment shall be supported by data substantiating the Subcontractor’s right to payment as the Contractor may reasonably require, such as evidence of payments made to employees and suppliers of Subcontractor, and *waiver of liens from suppliers in form specified by law*, and a *Subcontractor affidavit attesting that all amounts sought and which are payable for materials and labor supplied by third parties have been paid in full* from proceeds of payment in the Application for Final Payment.” (Emphasis added.) See Exhibit B, § 11.3.2.

***B. The Slab Work and the Defect Disputes.***

15. Forcine commenced the slab work in November 2022, completing the slab pour on December 8, 2022. See Exhibit C, portions of the Deposition Transcript of Nathan Ball, at 129:14–22, 130:5–8.

16. Forcine’s continuation sheet showed the slab work at 78.46% completion as of November 17, 2022. See Exhibit D, Pay App. No. 8 continuation sheet.

17. During the course of performing such work, on November 18, 2022, Forcine submitted Payment Application No. 8 in the amount of $43,146.14 to MS Park, seeking the release of 50% retainage. See Exhibit D, Pay App. No. 8.

18. The invoice transmitting Payment Application No. 8 expressly stated as the basis for the requested sum: "*Retainage reduction from 5% to 2.5% after 50% project completion.*" See Exhibit D, Pay App. No. 8 invoice transmittal.

19. As Forcine was pouring the slab, MS Park immediately noticed a multitude of issues, including a large crack and the presence of chemical reagent on the surface. See Exhibit E, Email from Mike Mesics to Brian Forcine dated December 6, 2022.

20. Forcine engaged Durable Surfaces to repair the crack in the slab. However, the repair "did not work." Exhibit F, Durable Surfaces Job Work Order dated December 8, 2022; Exhibit G, Email from Rich Futterer to Greg Yohn and Nathan Ball dated December 20, 2022.

21. This marked the beginning of MS Park discovering a long list of defects in the slab. While examining the slab in December 2022, MS Park discovered new and additional defects, including additional cracking, staining, and delamination. See Exhibit H, Email from George Muraviev to Nathan Ball dated December 15, 2022.

22. MS Park requested that, due to these additional issues, Forcine re-pour the slabs. See Exhibit I, Email from George Muraviev to Nathan Ball dated December 21, 2022.

23. Forcine refused and, instead, planned to address the issues by engaging Durable Surfaces to make the repairs. See Exhibit J, Email from Nathan Ball to George Muraviev dated December 20, 2022.

24. Despite this commitment, as the weeks passed, MS Park continued to discover new defects, including fibers sticking out of the floor slabs throughout the building. See Exhibit K, Email from George Muraviev to Nathan Ball dated December 23, 2022.

25. Due to the mounting issues, on January 11, 2023, both Forcine and MS Park met at the Project site. See Exhibit L, Email dated January 6, 2023; Exhibit M, Email dated January 11, 2023.

26. Following this meeting, MS Park engaged a third-party, CoGri, to evaluate Forcine's work on the slab. See Exhibit N, CoGri Report dated February 7, 2023.

27. Following CoGri's inspection of the slab, CoGri issued a report noting additional defects, including but not limited to: (1) significant areas of delamination; (2) open expansion joints, with a gap exceeding 0.59"; (3) additional cracks; (4) joint rocking; and recommended a "joint survey to establish the extent and degree of differential movement at the slab joints under MHE loading." See Exhibit N.

28. MS Park sent Forcine a copy of the CoGri report on February 17, 2023. See Exhibit O, Email from Mark Stiles to Brian Forcine dated February 17, 2023.

29. Forcine sent the CoGri report to Ductilcrete to review and respond. See Exhibit P, Email from Nathan Ball to Mark Stiles dated February 20, 2023.

30. On March 8, 2023, Ductilcrete responded, largely agreeing with the contents of the CoGri Report. See Exhibit Q, Ductilcrete's Response to the CoGri report dated March 8, 2023.

31. Specifically, Ductilcrete recommended, among other things: (1) repair of cracks that exceed a credit card width per the attached crack repair procedure; (2) repairing of arris damage; (3) testing the floor for delamination by chain dragging and repair as necessary; and (4) "[p]er the Ductilcrete Warranty and the attached detail, the Cross Joint Elevation Differential of each joint in question must be measured to determine compliance. Joints that move in excess of the Specified 0.20" must be stabilized." See Exhibit Q.

32. MS Park requested that Forcine proceed with CoGri's and Ductilcrete's recommendations, specifically chain dragging to identify delamination, measuring curled joints and stepped joints for elevation difference, and submission of a remediation plan. See Exhibit R, Email dated March 14, 2023.

33. Forcine engaged Durable Surfaces to perform the repair work. See Exhibit S, Email dated March 14, 2023.

34. Durable Surfaces commenced the repair work on March 24, 2023. See Exhibit T, Email dated March 20, 2023; Exhibit U, Durable Surfaces Job Invoices from March 24, 2023 to May 24, 2023.

35. On May 30, 2023, Forcine emailed MS Park advising that Durable Surfaces completed the repair work, attaching a report allegedly indicating "(1) all cracks that were repaired; (2) all cracks that were identified, but not substantial enough to warrant a repair; (3) all delamination repairs; (4) all should rebuilds, and (5) the elevated joints that needed to be ground down to meet flatness specifications." See Exhibit V, Email dated May 30, 2023.

36. On the same date, MS Park responded by requesting (1) the description and method of repairs made; (2) an official Ductilcrete certificate that repairs were made in accordance with Ductilcrete requirements; and (3) photos and videos of the repairs made. See Exhibit W, Email dated May 30, 2023.

37. Forcine did not respond to or provide the requested information.

38. As Durable Surfaces was performing work to correct the defects, on May 15, 2023, Forcine submitted Payment Application No. 10 for the release of the final retainage in the amount of $55,031.16. See Exhibit X, Pay App. No. 10.

39. On June 7, 2023, MS Park's counsel sent Forcine a written letter rejecting Forcine's request for the release of final retainage, stating that Plaintiff had not adequately completed the work on the Project. The June 7, 2023 letter issued eight (8) days after Forcine's May 30, 2023 "completion" notice. See Exhibit Y, Letter from MS Park's Legal Counsel to Forcine dated June 7, 2023.

40. Instead of correcting the remainder of the defective work, Plaintiff refused to perform any additional work, demanding mediation for the release of retainage and unapproved change orders. See Exhibit Z, Letter from Forcine's Legal Counsel to MS Park dated June 22, 2023.

41. Despite Forcine's demand for final payment, it was evident that Forcine had not completed all of the repair work. Upon further inspection of the slab, Forcine had never tested the joint rocking on the slab in accordance with Ductilcrete's recommendation. See Exhibit U.

42. On September 13, 2023, MS Park transmitted to Forcine a written defect list with a diagram by Aaron Stiles identifying the remaining defects. See Exhibit AA, Email from MS Park to Forcine dated September 13, 2023, with Stiles diagram.

43. It was not until after the September 13, 2023 notice that Forcine engaged Durable Surfaces' owner Christopher Wright to perform a site visit and test for joint rocking. Even after this inspection, Forcine refused to provide any

additional remedial work.

44. Forcine never produced an Architect's Certificate for Payment, a signed punch-list completion, written approval from MS Park, approval from any Control Inspector, Engineer, Township Inspector, or Third-Party (including Bank) Inspector, or any waiver of liens or Subcontractor affidavit required by Subcontract §§ 11.3.1 and 11.3.2.

45. In fact, Forcine's principal, Brian Forcine, admitted that Forcine never submitted the closeout lien release, stating: "I think we were trying to get our winter concrete costs." See Exhibit HH, Brian Forcine Deposition ("Forcine Dep.") 107:19–24.

***C. The Winter-Concrete Change Orders.***

46. On October 26, 2022—before any cold-weather pour—Forcine first raised proposed winter-concrete charges. MS Park rejected the request the same day. See Exhibit BB, October 26, 2022 correspondence.

47. On November 21, 2022, Forcine submitted a written change order request for winter-concrete charges. MS Park rejected the request in writing on November 30, 2022. See Exhibit CC, Forcine November 21, 2022 change order and MS Park November 30, 2022 rejection.

48. On November 29, 2022, Forcine submitted a further written change order request for winter-concrete charges. MS Park rejected the request in writing.

See Exhibit DD.

49. On December 6, 2022, Forcine submitted a further written change order request for winter-concrete charges. MS Park rejected the request in writing on December 6, 2022. See Exhibit EE.

50. On December 14, 2022, Forcine submitted a further written change order request for winter-concrete charges. MS Park rejected the request in writing. See Exhibit FF.

51. On January 23, 2023, Forcine resubmitted the winter-concrete change-order requests. MS Park rejected the resubmission in writing on January 27, 2023. See Exhibit GG.

52. The cumulative amount of the winter-concrete change-order demand is $95,848.03.

53. The record contains no signed change order, written field authorization or directive, email approval, Construction Change Directive, signed time-and-materials sheet, reservation-of-rights agreement, or other writing reflecting MS Park's authorization of any portion of the winter-concrete change orders.

54. Forcine did not submit any formal delay claim under Subcontract § 9.4 with respect to the conditions giving rise to the alleged winter-concrete charges.

*D. Deposition Testimony.*

55. Brian Forcine, owner of Forcine Concrete and Construction Company, acknowledged that Forcine never submitted a formal delay claim with respect to the slab work. See Exhibit HH, Forcine Dep. 98:5–7.

56. Brian Forcine acknowledged: "that the retainage is held to ensure that the contractor is going to complete his work." See Exhibit HH, Forcine Dep. 106:11–15.

57. Brian Forcine stated the Forcine engaged Durable Surfaces: "[t]o try and pacify Mr. Stiles." See Exhibit HH, Forcine Dep. 86:14–15.

58. Christopher Wright was hired in 2002 by Brian Forcine to build Durable Surfaces and was a 20% founding owner of Durable Surfaces. Brian Forcine, Rich Futterer, Brad Forcine, and Johnny Evans funded the venture. See Exhibit II, Christopher Wright Deposition ("Wright Dep.") 29:14–30:5; Exhibit JJ, Derek Cressman Deposition ("Cressman Dep.") 28:1–3.

59. In December, Rich Futterer was an owner of Durable Surfaces when Forcine engaged Durable Surfaces for the work on the Project. Exhibit II, Wright Dep. 58:9–23.

60. Rich Futterer signed the Subcontract on Forcine's behalf, and was a contemporaneous owner of Durable Surfaces. See Exhibit II, Wright Dep. 119:25–120:7.

61. Durable Surfaces admitted that it had not completed its work on the Project, but “stopped when Forcine had instructed us … that we were to stop”—not because the work was complete. Exhibit JJ, Cressman Dep. 105:19–22; 106:8-16( When asked if Mr. Cressman “all the work that was agreed upon … [was] performed on the project,” Mr. Cressman answered: “No. It wasn’t all performed.”).

62. Mr. Cressman admitted that the stabilization “film” was never installed, and that stabilization “should not be done without the joint fill being complete.” Exhibit JJ, Cressman Dep. 106:18–107:1.

63. Durable Surfaces never returned to perform further repair work after Mr. Wright’s September 21, 2023 site assessment. Exhibit II, Wright Dep. 134:19–22.

64. At his deposition, when asked whether MS Park’s principal ever stated at the only direct meeting between principals that “Forcine would repair everything,” Brian Forcine answered in the negative. Forcine Dep. 123:22–24.

Respectfully submitted,

**FLORIO PERRUCCI STEINHARDT CAPPELLI & TIPTON, LLC**

Dated: 5.26.2026

By: /s/ Katharine Fina

Katharine A. Fina, Esq.
(Pa Attorney ID 315965)
91 Larry Holmes Drive, Suite 200
Easton, PA 18042
(610) 691-7900
KFina@floriolaw.com
*Attorneys for Defendants*