**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FORCINE CONCRETE & CONSTRUCTION COMPANY | : | |
| | : | NO. 3:23-cv-02024 |
| Plaintiff, | : | (Judge Leo A. Latella) |
| v. | : | |
| MS PARK CONSTRUCTION LLC f/k/a RESEARCH LLC, ET. AL | : | |
| Defendant. | : | |

**PLAINTIFF, FORCINE CONCRETE & CONSTRUCTION COMPANY'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

***A. The Subcontract***

1. Forcine admits that PNK P1, LLC was the owner of the Property from February 23, 2021 until it sold the Property to Patton Hazleton, LLC on or about October 6, 2023. Forcine denies that Exhibit "A" is a true and correct copy of the Agreement between PNK P1, LLC ("PNK P1") and MS Park Construction, LLC ("MS Park") f/ka/ Research, LLC ("Research"). By way of further response, Exhibit "A" is a Standard Form of Agreement purportedly between Owner and Contractor between PNK P1 and Research. However, Exhibit "A" was executed on behalf of PNK P1 by Park Mun Seong ("Park") and on behalf of Research by Alex Rozengaus

("Rozengaus"), pursuant to which Research was purportedly going to serve as the contractor for the construction of a warehouse on the Property (the "Project"). *See* Defendant's Statement of Material Facts ("DSMOF") at Exhibit A. In reality, both entities were owned and controlled by Andrey Sharkov ("Sharkov"). *See* MS Park's Responses to Forcine's First Set of Interrogatories, attached as **Exhibit 1**, at p. 7. Park was a straw man that Sharkov used to evade taxes in Russia, while Rozengaus was the owner of a separate company, Builderdome, LLC ("Builderdome"), that was actually engaged by PNK P1 to serve as the contractor for the Project. *See* Relevant portions of the Deposition of Andrey Sharkov ("Sharkov Dep."), attached as **Exhibit 2**at 34:17-36:12. Ultimately, Research, and its successor, MS Park, failed to perform any of the functions required of the Contractor in this sham Agreement. *See* Relevant portions of the Deposition of Alex Rozengaus ("Rozengaus Dep."), attached as **Exhibit 3** at 18:17-21, 43:10-14.

2. Forcine admits that the document attached as Exhibit "A" purports to be a contract dated September 1, 2021 between Research and PNK P1 for the construction of the Project. However, for the reasons described in response to paragraph 1, supra, this Agreement is a sham.

3. Forcine admits that Research (the predecessor of MS Park) subcontracted with Forcine to install the foundations and slab on grade for

$1,808,700, plus authorized add-alternates. Forcine denies that Exhibit "B" is a complete, true and correct copy of the Subcontract. By way of further response, the Subcontract incorporates additional documents that form the entire contract for Forcine's work on the Project, including but not limited to the incorporated drawings and specifications, the approved Ductilcrete design, and the Ductilcrete warranty. *See* DSMOF, Ex. B at §§ 1.1, 15.1, and Ex. A.

4. Admitted.

5. Admitted.

6. Denied. By way of further response, Defendants mischaracterize and selectively quote the words set forth in Article 4.6.1 of the Subcontract, which speaks for itself.

7. Denied. By way of further response, Defendants mischaracterize the language set forth in Article 9 of the Subcontract. Specifically, with respect to the Foundation Work, Forcine agreed to complete the work within five weeks of receipt of notice to commence the work, as it provides: "Subcontractor shall be given two (2) weeks advance notice to commence the Work, and the Work shall be completed no later than three (3) weeks from the commencement of the work." With respect to the Slab Work, Article 9.2.2 provides: "Subcontractor shall be given two (2) weeks advance notice to commence the Work, and the Work shall be completed no

later than eight (8) weeks from the commencement of the work." *See* DSMOF, Ex. B at Art. 9.2.2.

8. Denied as stated. By way of further response, Defendants selectively quoted only certain language of Article 11.1.2 of the Subcontract, which speaks for itself. Specifically, Defendants left out the following critical language: "A Service charge of 1.5% (18% per year) will be charged on all unpaid invoices over thirty (30) days." *See* DSMOF, Ex. B at Art. 11.1.2.

9. Admitted.

10. Denied. By way of further response, Defendants mischaracterized and omitted critical information from Article 11.1.8.2 that sets forth that the full amount of retainage being withheld would be **reduced** (as opposed to merely a limitation on future retainage. Specifically, Article 11.1.8.2 provides:

> **§ 11.1.8.2** Reduction or limitation of retainage, if any, shall be as follows:
> *(If the retainage established in Section 11.1.8.1 is to be modified prior to substantial completion of the entire Work, including modifications for substantial completion of portions of the Subcontractor's Work as provided in Section 9.2.3, insert provisions for such modification.)*
>
> After 50% completion, retainage shall be reduced to 2.5%.

*See* DSMOF, Ex. B at Art. 11.1.8.2.

11. It is admitted that Defendants accurately quoted Section 11.1.7.1.3. It is denied that the Owner can legally withhold payment for extra work by refusing to execute a change order to which Forcine is unquestionably entitled to in bad faith.

12. Denied. By way of further response, Defendants mischaracterized and omitted critical information from Article 11.1.7.2 of the Subcontract, which speaks for itself. By way of further response, pursuant to Article 11.1.9 of the Subcontract, Research was required to provide notice to Forcine upon the partial or entire disapproval of any payment application. *See* DSMOF, Ex. B at Art. 11.1.9. Pursuant to the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), Research was compelled to provide that notice within 14 calendar days of the date after receipt of the invoice; otherwise, it waived the basis to withhold payment and is required to pay Forcine in full for the invoice. 73 P.S. §§ 506(b), 511(b).[1]

13. Denied. By way of further response, Defendants did not provide the full and complete content of Article 11.3.1 of the Subcontract. Specifically, it provides: "If, for any cause which is not the fault of the Subcontractor, a Certificate for Payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within seven days after receipt of payment from the

[1] Because Research was simply a shell corporation for the benefit of the Owner, PNK P1, Forcine should be considered a "Contractor" under CASPA (as opposed to a Subcontractor), as the "Owner" is defined as "a person who has an interest in the real property that is improved and who ordered the improvement to be made" and expressly includes "successors in interest of the owner and agents of the owner acting with their authority." 73 P.S. § 502. Regardless of whether Research is considered an Owner or a Contractor, the deadline for providing a statement of the reason for withholding is 14 days from the date of the invoice (for an Owner) or 14 days from the date of a receipt of the statement for the reasons for withholding from the Owner (for a Contractor). 73 P.S. §§ 506(b), 511(b).

Owner, final payment to the Subcontractor shall be made upon demand." *See* DSMOF, Ex. B at Art. 11.3.1.

14. Denied. By way of further response, Defendants did not provide the full and complete content of Article 11.3.2 of the Subcontract, which speaks for itself. *See* DSMOF, Ex. B at Art. 11.3.2.

***B. The Slab Work and the Defect Disputes***

15. Admitted.

16. Denied. By way of further response, In Forcine's Payment Application No. 8, which was for work period through November 30, 2022, provides that the Ductilcrete Slab on Grade work was only 75% complete. DSMOF, Ex. D at Item #3.

17. Denied. By way of further response, the Invoice attached as Exhibit D is dated November 30, 2022.

18. Admitted.

19. Denied. By way of further response, Forcine denies that there were a "multitude of issues" identified during the pouring of the slab. Further, the email attached as Exhibit E is not an email where MS Park is identifying issues; rather, it is an internal Forcine email where they discuss one crack that occurred on November 30, 2022. The individual who sent the email, Mike Mesics, testified that this crack

occurred in an area where the owner's sprinkler contractor was improperly driving a forklift on a portion of the slab that had been poured only a couple days before. Mr. Mesics brought it to the attention of the Owner's representative, Roman, who was "pretty upset" with the contractor that was operating a forklift on the slab before it had cured for at least seven days. *See* Relevant Portions of the Deposition of Michael Mesics attached hereto at **Exhibit 4**, at 191:9-198:12. Indeed, the forklift's tire tracks are evident from the first and second photographs attached to DSMOF at Exhibit E.

20. Forcine admits that it engaged Durable surfaces to repair the crack in the slab. While the initial repairs performed on November 8, 2022 did not fully address the situation, Durable Surfaces returned to the site to fully repair the crack. *See* Durable Surfaces Invoice #4971, attached hereto as **Exhibit 5.**

21. Denied. By way of further response, Forcine disputes that MS Park discovered "a long list of defects in the slab." Indeed, the document attached to DSMOF at Exhibit H only attaches one photograph, which shows some delamination, which is not uncommon with Ductilcrete slabs. Indeed, the Ductilcrete Warranty, which was incorporated into the Subcontract, provides in pertinent part:

C. Delamination

> 1. Less than two-thousandths of one percent (.002%) of the total floor area **is expected to delaminate visibly.** All such visible surface failures will be repaired.
>
> 2. "Hollow sounds" heard when an otherwise satisfactory surface is tapped or dragged with a chain are not delamination defects. No repairs will be made to eliminate the emission of such sounds.

A copy of the Ductilcrete Warranty is attached as **Exhibit 6** at 1.5(C) (emphasis added).

22. Denied. By way of further response, George Muraviev, an employee of A Class Capital who purported to represent the "PNK Group," demanded that Forcine repour slabs if floor slab repairs will "spoil it's appearance[.]" DSMOF, Ex. I. However, Mr. Muraviev's demand for repouring concrete slabs over cosmetic concerns was wholly inconsistent with the Ductilcrete Warranty that is incorporated into the Subcontract, which explains to the purchaser of a Ductilcrete system that the warranty does not cover any inconsistencies and that inconsistencies in the floor's appearance are inherent in the nature of the product:

R. Cosmetics

> 1. DuctilCrete is not an architectural material; it is an industrial material.
>
> 2. It is intended to provide a robust floor slab capable of sustaining the anticipated traffic and live

loads indefinitely, while simultaneously employing significantly fewer joints and experiencing much less curling and problem cracking.

3. Since DuctilCrete's principal constituent is conventional Type|, Type I/II, or Type I/V concrete, it is subject to the same problems with consistency in appearance that are encountered with conventional floor slabs.

4. While every reasonable effort will be made to ensure uniform cosmetics, **this warranty does not cover any inconsistencies that may occur in the Floor's appearance**.

S. Cosmetics of Warranty Repairs

1. All concrete floor repairs have cosmetic consequences, and while every repair made by the DL/I Warrantor will be performed in a professional and workmanlike manner, and every reasonable effort will be made to minimize the repair's visual impact, **there is no warranty concerning the final appearance of any repair**.

2. All repairs are intended solely to bring the Floor into conformity with its warranted integrity**. In all cases, the repair's appearance will be considered secondary to its durability.**

Ductilcrete Warranty, Ex. 6 at 1.5(R) – (S) (emphasis added). If that was not clear enough, the Ductilcrete Warranty includes the following "Warranty Modifiers":

1. DuctilCrete is not an architectural product. It is an industrial product that routinely must be manufactured under far less than ideal conditions. Asa consequence, **it typically will exhibit the kind of cosmetic imperfections** that are inevitably created by its uncontrolled production environment. . . .

4. While every reasonable effort will be made to ensure relatively uniform cosmetics, **no warranty is either expressed or implied regarding any inconsistencies that may occur in any slab's appearance**.

*Id.* at 1.7(A) (emphasis added).

23. Denied as stated. By way of further response, Forcine did not "refuse" to make repairs. Rather, consistent with the Ductilcrete Warranty, Forcine reached out to Ductilcrete, who provided guidance on the warranty repair procedures. Then, Forcine engaged Durable Surfaces to perform the repairs in accordance with Ducticlrete's recommendations and the Ductilcrete Warranty. *See* DSMOF, Ex. J.

24. Denied. By way of further response, the email attached as Exhibit K to DSMOF is from George Muraviev, an employee of A Class Capital who purported to be a member of the fictitious brand "PNK Group" – not an employee or representative of MS Park. Further, Forcine disputes that fibers sticking out of the surface are indicative of a defect or that repairs are required. In fact, Camron Provost from Ductilcrete explained: "Fibers sticking out of the surface are expected with any fiber reinforced concrete. Sometimes they can burn off with the trowel finish, but others can remain or poke up after the fact. In our experience, these will disappear over time when the facility is in operation." A copy of the 12/23/22 email from Cameron Provost is attached as **Exhibit 7.**

25. Denied. By way of further response, "MS Park" did not meet at the Project site. Indeed, Mr. Park admitted that he never visited the Project site. *See* Rozengaus Dep. (Ex. 3) at 67:10-23 (testifying that Mr. Park never attended project meetings, engaged in conversations related to the Project, had no day-to-day involvement, never visited the project site, and had no involvement in dealing with subcontractors); relevant portions of the deposition transcript of Park Mun Seong ("Park Dep."), attached as **Exhibit 8** at 30:21-33:9 (testifying that he did not even read the documents he was requested to sign and signed them without knowing the context behind the documents). Rather, Defendants Stiles and Sharkov attended a walk through with representatives of Forcine, Durable Surfaces, and Ductilcrete. *See, e.g.*, DSMOF, Ex. L.

26. Denied. By way of further response, as stated on page 1 of the Cogri Report attached to DSMOF at Exhibit N, Cogri was not engaged by MS Park; rather, "Cogri were commissioned by PNK Group…"

27. Forcine admits that Cogri issued a report that was provided to Forcine on February 17, 2023. Forcine denies that the CoGri 2/17/23 notes "additional defects." Rather, the report identified certain warranty items that needed repaired, and other items that were inherent in the nature of Ductilcrete slabs that did not require repairs. Forcine provided the 2/17/23 Cogri Report to Ductilcrete, who

reviewed the report to determine what warranty repairs were necessary. Ductilcrete issued a response identifying all warranty repairs that were required under the warranty. DSMOF, Ex. P. Forcine then engaged Durable Surfaces to perform all of the repairs required by the Ductilcrete Warranty, and those repairs were performed from March through May, 2023. *See* May 30, 2023 Email from Nathan Ball to Mark Stiles re: Completed warranty work at Humboldt Lot 25B (FCC-PROD_MSP0002300), a copy of which is attached as **Exhibit 9**

28. Denied. By way of further response, Mark Stiles sent Forcine a copy of the 2/17/23 CoGri Report – not MS Park. *See* DSMOF, Ex. O. Mr. Stiles is not an owner or employee of Research/MS Park. *See* Deposition transcript of Mark ("Stiles Dep."), relevant portions of which are attached as **Exhibit 10**, at 90:11-91:10.

29. Admitted.

30. Denied. By way of further response, Forcine admits that Ductilcrete responded to the 2/17/23 CoGri Report. However, Forcine denies that it "largely agreed with the contents of the CoGri Report."

31. Denied. By way of further response, Ductilcrete's response to the 2/17/23 Cogri Report speaks for itself.

32. Denied. By way of further response, Exhibit R is an email where Forcine provided Ductilcrete's response to the 2/17/23 Cogri Report, and does not include any "request" from MS Park to proceed with Ductilcrete's recommendations. To the contrary, Mark Stiles of PNK Group directed Ductilcrete to proceed with the testing described in the Ductilcrete Response. *See* DSMOF, Ex. Q.

33. Denied. By way of further response, Forcine admits that in the document attached to MS Park's SOMF as Exhibit S, Forcine advised Mark Stiles that it had engaged Durable Surfaces to perform certain testing required by the Ductilcrete Warranty, including chain dragging and measuring joints. *See* DSMOF, Ex. S.

34. Denied. By way of further response, Durable Surfaces first commenced repair work in accordance with the Ductilcrete Warranty on December 8, 2022. *See* DSMOF, Ex. F (Job Work Order from Durable Surfaces dated 12/8/22 for "crack repair" and "saw cut repairs").

35. Admitted.

36. Denied. By way of further response, Exhibit W to DSMOF is not a May 30, 2023 email, as alleged in paragraph 36. Rather, it is a June 7, 2023 letter from MS Park's former outside counsel, Wally Zimolong, Esq. to Forcine's counsel.

37. Denied. By way of further response, Forcine responded to Mr. Zimolong's June 7, 2023 letter attached as Exhibit W on June 22, 2023. A copy of this letter is attached to DSMOF at Exhibit Y.

38. Denied. By way of further response, Forcine admits that it submitted Payment Application No. 10 on May 15, 2023. Forcine denies that this was "as Durable Surfaces was performing work to correct the defects."

39. Denied. By way of further, Exhibit Y to DSMOF is a letter from Cohen Seglias dated June 22, 2023 – not a June 7, 2023 letter from MS Park's Legal Counsel. Forcine admits that MS Park's counsel sent a letter to Forcine on June 7, 2023, the contents of which are attached as Exhibit W to DSMOF.

40. Denied. By way of further response, Plaintiff's counsel's 6/22/23 letter to MS Park's counsel is attached as Exhibit Y to DSMOF (not Exhibit Z as alleged). Further, Forcine did not refuse to perform or demand mediation in this letter. Rather, Forcine stated that it wanted to discuss an amicable resolution of the matter, but if one was not reached, it was prepared to file a Demand for Mediation.

41. Denied. By way of further response, Forcine did perform joint rocking testing on the slab and determined that it was in compliance with the Ductilcrete Warranty. *See* 9/21/23 Report of Chris Wright of Durable Surfaces, a copy of which is attached as **Exhibit 11.**

42. Denied. By way of further response, Mark Stiles (not MS Park) transmitted to Forcine a drawing showing that showed joints and cracks that he requested to be repaired. *See* DSMOF, Ex. AA. Forcine is unaware who "Aaron Stiles" is, and whether he is the one who prepared the drawing.

43. Denied. By way of further response, the document attached as Exhibit AA to DSMOF is not a "notice" or "written defect list"; rather, it is an email attaching a marked-up drawing. Durable Surfaces was engaged months prior to perform inspections and warranty repairs. *See, e.g.*, DSMOF, Ex. F (Durable Surfaces Job Work Order dated December 8, 2022). Forcine admits that Christopher Wright of Durable Surfaces performed testing for joint rocking on September 18, 2023, and issued a report on September 21, 2023 with the results, which showed that the joint rocking fell within the allowable tolerances provided in the Ductilcrete Warranty. *See* Ex. 11 (9/21/23 Chris Wright Report). That report was reviewed by Ductilcrete, who agreed with Mr. Wright's conclusions. A copy of the 10/3/23 Ductilcrete Report is attached as **Exhibit 12.**

44. Denied. By way of further response, MS Park never issued a punch list for the Project; thus, there was no punch list to get signed by the Architect. During the entire course of the Project, the Architect never issued a Certificate for Payment with respect to any of Forcine's Applications for Payment. *See* Copies of the

Payment Applications attached hereto as **Exhibit 13.** The lack of a Certificate of Payment from the Architect did not preclude payment on Forcine's prior invoices; therefore, MS Park waived the requirement. Further, it is apparent from MS Park's document production that they did not engage the Project Architect, Bernardon PC, to perform construction administration services, including the review and certification of payment applications. Despite demand, Defendants have not produced a copy of their contract with the Architect, Bernardon PC. *See* MS Park's Response to Forcine's Requests for Production, attached as **Exhibit 14,** at Request #4. Further, Defendants did not produce a single communication to or from Bernardon PC in discovery, making it clear that the Architect was not involved in the Payment Application process for this Project. Indeed, despite a contractual obligation to do so, Research/MS Park never submitted any payment applications to the Owner for this Project. Rozengaus Dep. (Ex. 3) at 64:1-3. Forcine did not submit waiver of liens or subcontractor affidavits in connection with its final payment application because MS Park still owed Forcine outstanding payments for the Project, which resulted in Forcine filing a lien on the Project. A copy of Forcine's Mechanics' Lien Claim is attached as **Exhibit 15**; *see also* Forcine Dep. (Ex. 32) at 107:19-24. Further, MS Park has not identified any approval from a Control Inspector, Engineer, Township Inspector, or Third-Party (including the Bank

Inspector) that was required or withheld, as the Project received a permanent Certificate of Occupancy, was occupied beginning in May 2023, and was sold on October 10, 2023. *See* 2/14/25 Deposition Transcript of Thierry Lindor, corporate designee for Patton Hazleton, relevant portions of which are attached as **Exhibit 16**, at 61:17-64:19 (testifying that Patton Hazleton was operating the facility daily under a license agreement that began in late May 2023); *id.* at 129:18-21 (testifying that the settlement date for the sale of the property was October 10, 2023).

45. Forcine admits that it never submitted its closeout lien release with its Final Application for Payment because MS Park had not paid Forcine in full for all prior Applications for Payment.

***C. The Winter-Concrete change Orders.***

46. Denied. Forcine admits that in accordance with the Subcontract, it provided advanced notice to MS Park that the costs associated with winter concrete were a change to the Subcontract for which it intended to seek compensation. A copy of the 10/26/22 email chain (FCC-PROD_MSP0006604) between Forcine and Alex Rozengaus (a purported representative of MS Park) is attached as **Exhibit 17.** Forcine denies that the correspondence attached as Exhibit BB to DSMOF includes a "rejection" of the request. Rather, that email asks Forcine whether it will pick up the winter concrete costs, to which Forcine responded unequivocally that it would

not pick up those costs. Then, on October 31, 2022, Forcine followed up by providing a zero cost change order to fully disclose the unit costs for winter concrete, stating that the work was beyond the scope of Forcine's contract, and that it intended to resolve this issue either via change order or the claim process in the Subcontract. A copy of the 10/31/2022 email (MSP_005022) is attached as **Exhibit 18.** MS Park did not respond. Forcine followed up with Change Orders for winter concrete costs on November 21, 2022, November 29, 2022, December 6, 2022, and December 14, 2022. Copies of the emails transmitting these change orders are attached as **Exhibit 19.** On November 30, 2022, MS Park responded that the change orders were sent to the "HO" (or "home office") for review. DSMOF, Ex. DD. George Muraviev ultimately rejected the request on December 6, 2022; however, as part of that rejection, he directed Forcine to proceed with the winter concrete work. *See* 12/6/22 Email from George Muraviev (FCC-PROD_MSP0005017-5019), attached as **Exhibit 20.**

47. Forcine admits it submitted Change Order No. 10 for Winter Concrete on November 21, 2022. *See* 11/21/22 email transmitting Change Order #10, attached as **Exhibit 21.** Forcine denies that MS Park rejected the request in writing on November 30, 2022. Rather, George Muraviev sent Forcine a "Notice of Claim" on December 6, 2022, that rejected Forcine's change order, but directed Forcine to

continue the work to completion and use winter concrete if necessary. DSMOF, Ex. DD. Mr. Park – whose digital signature is on the document – had no knowledge of the contents of this letter and admitted that he did not write it. *See* Park Dep. (Ex. 8) at 97:17-98:8.

48. Forcine admits it submitted Change Order #11 for winter concrete costs on November 29, 2022. *See* 11/29/22 Email transmitting Change Order #11, a copy of which is attached as **Exhibit 22.** Forcine denies that Exhibit EE to DSMOF is a "rejection" of that change order. Rather, that email expresses that Alex Rozengaus sent the change order to the "home office" for review.

49. Forcine admits that it submitted Change Order #13 for winter concrete costs on December 6, 2022. Forcine denies that MS Park rejected the request in writing on December 6, 2022. Rather, George Muraviev sent Forcine a "Notice of Claim" on December 6, 2022, that rejected Forcine's change order sent on November 16, 2022, but directed Forcine to continue the work to completion and use winter concrete if necessary. DSMOF, Ex. DD. Mr. Park – whose digital signature is on the document – had no knowledge of the contents of this letter and blindly signed it at the request of Muraviev. *See* Park Dep. (Ex. 8) at 97:17-98:8.

50. Forcine admits that it submitted Change Order Request #14 for Winter Concrete on December 14, 2022. Forcine denies that MS Park rejected the Change

Order Request via letter dated 12/14/22. Rather, on 12/14/22, George Muraviev sent a letter to Forcine responding to Forcine's December 7, 2022. DSMOF, FF. Mr. Park – whose digital signature is on the document – had no knowledge of Forcine's winter concrete claims. *See* Park Dep. (Ex. 8) at 97:17-98:8.

51. Denied. By way of further response, Forcine did not "resubmit" the change orders; rather, it sent a letter following up on Forcine's pending change orders for winter concrete. A copy of this email and letter are attached as **Exhibit 23** (FCC-PROD_MSP00004068). Forcine denies that MS Park rejected those change orders in the email attached to DSMOF as Exhibit FF. Rather, George Muraviev (an employee of A-Class Capital, not MS Park), responded expressing "surprise" that Forcine wanted additional payment for winter concrete costs (despite the numerous notices and letters sent by Forcine). DSMOF, Ex. FF. Mr. Muraviev did not "reject" the change orders; rather, he requested that Forcine reconsider its pursuit of these change orders under the threat that PNK would "black list" Forcine, post that Forcine is "black listed" on its website, and would not invite Forcine to bid on future projects. DSMOF, Ex. FF. This is not a good faith "rejection" of a change order – it is an attempt at extortion.

52. Forcine admits that its claim for winter concrete change order work is $95,848.03, exclusive of interest, penalties, and attorneys' fees pursuant to the Contractor and Subcontractor Payment Act and the Subcontract.

53. Denied. By way of further response, the record is replete with directives for Forcine to proceed with the winter concrete work, and Forcine's reservations of rights to pursue its additional costs via the claim process. *See, e.g.*, Ex. 17 (10/26/22 email from Nathan Ball); Ex. 18 (10/31/2022 Email from Nathan Ball); Ex. 22 (11/29/22 email from Nathan Ball); DSMOF, Ex. EE (letter from Park Mun Seong stating "**Forcine [is] directed to continue the work to completion**, and if necessary, to use winter concrete at its own expense.") (emphasis added).

54. Denied. By way of further response, Forcine's winter concrete change orders were a formal claim related to the delay, as the parties originally anticipated that Forcine would pour the slabs in late summer/early fall, which resulted in Forcine not including winter concrete costs in the Subcontract Price, and expressly excluding all winter concrete work from the Subcontract. *See* 10/4/22 email from Alex Rozengaus, attached as **Exhibit 24** (admitting that when the agreement was executed they "aimed for slab in August or September 2022."). However, Forcine admits that it did not submit a claim for additional time or extended general conditions because such a claim was not necessary. Pursuant to Article 9.2.2 of the Subcontract, the

Owner was required to provide Forcine with two weeks' advance notice to commence the slab work, and Forcine was provided eight weeks from the commencement of the work to complete the slab work. DSMOF, Ex. B at § 9.2.2. However, Forcine could not proceed with the slab work until MS Park selected on of the alternates for the supplier of the slab on grade concrete. *See Id.*, Ex. A, Alternate Section, at Paragraph 5-7. Forcine followed up with MS Park to select the alternate on May 23, 2022, July 26, 2022, August 25, 2022, August 26, 2022, and September 6, 2022. Copies of these emails are attached as **Exhibits 25 through 29.** Forcine advised MS Park of the impact on the availability of suppliers on the pour schedule on October 4, 2022. A copy of this email is attached as **Exhibit 30.** Indeed, even Rozengaus admits that the earliest MS Park could have possibly issued a notice of commencement was September 20, 2022, when MS Park finally selected the thickness of the slab (but still failed to make a selection of the supplier per the alternate). *See* Rozengaus email dated November 1, 2023, attached as **Exhibit 31.** As a result, the scheduled duration of Forcine's work extended into the cold weather season and necessitated winter concrete pours. Critically, MS Park never asserted any delay claim against Forcine either.

### *D. Deposition Testimony*

55. Denied. By way of further response, Page 98, lines 5-7 of Mr. Forcine's deposition transcript (Exhibit HH)does not discuss a "formal delay claim"; rather, it is addressing Mr. Forcine questioning who "MS Park" is.

56. Denied. By way of further response, Mr. Forcine was asked, in general (not specific to this project) what the purpose of retainage was, and he responded "I think that the retainage is held to ensure that the contractor is going to complete his work." DSMOF, Ex. HH at 106:11-15.

57. Denied. By way of further response, Mr. Forcine testified that he thought Forcine hired Durable "to do something on the project" but he didn't know what. DSMOF, Ex. HH at 86:8-15.

58. Denied. By way of further response, Mr. Wright testified that he was hired in 2002 by Forcine Concrete & Construction Company to, among other things, establish a concrete repair and restoration business that did not exist previously and that ultimately was named Durable Surfaces. DSMOF, Ex. II at 29:14-30:5. Mr. Cressman did not testify as to the ownership shares of Durable Surfaces; rather he testified that he "believe[d] that the shareholders of Forcine were the funding behind it." DSMOF, Ex. JJ at 28:1-3.

59. Denied. By way of further response, Defendants do not state which "December" they are referring to. Further, the referenced citation in the Deposition Transcript of Christopher Wright does not discuss the ownership structure when Durable Surfaces performed work on this Project; rather, it addresses the ownership structure back in 2004. *See* DSMOF, Ex. II at 57:16-58:23

60. Denied. By way of further response, Forcine admits that Rich Futterer signed the Subcontract on Forcine's behalf; however, Forcine denies that Mr. Futter was the contemporaneous owner of Durable Surfaces. Rather, Mr. Futterer was a minority shareholder in Durable Surfaces at the time, and had no involvement in the operation of Durable Surfaces' business. *See* DSMOF, Ex. II at 119:21-120:10.

61. Denied. By way of further response, Mr. Cressman did not testify that it work was "not completed." Rather, he testified that it was "not for [him] to determine" whether any additional repair work was necessary; rather, it was the "licensee and the warranty" that governed whether additional repair work was necessary. *See* DSMOF, Ex. JJ at 105:17-106:2. Further, Mr. Cressman testified that the joint stabilization work could not be performed until the Owner performed the joint fill work, which was never performed. *Id.* at 106:21-107:1.

62. Admitted.

63. Admitted.

64. Denied. By way of further response, Defendants did not attach the referenced portion of Brian Forcine's deposition as an exhibit in accordance with Fed. R. Civ. P. 56(c)(1) and LR 56.1. By way of further response, the allegation in this paragraph does not make sense nor does it match the question asked. Mr. Forcine was asked "Do you recall making a promise to him [Andrey Sharkov] that Forcine would repair everything?" He responded "No, I didn't." In fact, Mr. Forcine testified that he did not make any promises to Mr. Sharkov at this meeting or otherwise. *See* Relevant Portions of Deposition Transcript of Brian Forcine, attached as **Exhibit 32** at 123:22-124:10.

## FORCINE'S COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. The Subcontract and Project Timeline

65. On February 10, 2022, Forcine entered into a written subcontract (the "Subcontract") with Defendant, MS Park Construction LLC f/k/a Research LLC's ("MS Park") to perform work on a construction project known as the Humboldt Lot 25B Project (the "Project"), located at 405 Stony Creek Road, Hazle Township, PA 18202 (the "Property"). DSMOF, Ex. B.

66. The Subcontract required Forcine to provide labor, materials, and equipment for the installation of concrete, including but not limited to the installation

of the foundations and the slab on grade for the Project. *See id.*, Art. 8; *see also id.* at Exhibit "A."

67. The slab on grade to be installed by Forcine was to be made of Ductilcrete®, a proprietary engineered slab system, that also included a specific Ductilcrete Warranty. *Id.* at Exhibit "A."

68. At the time of execution of the Subcontract, the Property was owned by Sharkov and Stiles through a single-purpose entity that they created, Defendant, PNK P1, LLC ("Owner" or "PNK P1"). *See id.* at p.1.

69. The Subcontract contains Section 6.4, entitled "Waiver of Consequential Damages." *Id.* at p. 12, § 6.4.

70. Section 6.4 provides that the parties mutually waive claims for consequential damages arising out of or relating to the Subcontract. *Id.*

71. Section 6.4 expressly includes within the scope of waived consequential damages any claims for loss of use, loss of profits, loss of financing, loss of business, loss of reputation, and other indirect or consequential economic losses. *Id.*

72. MS Park does not dispute that Section 6.4 is part of the Subcontract.

73. MS Park does not dispute that Section 6.4 was in effect at all times relevant to the Project.

74. Forcine completed its work on December 8, 2022. *See* Manager's Certificate of Incumbency and Authorization for MS Park Construction, LLC, attached as **Exhibit 33,** at "Exhibit B" (stating that the "Date of Completion" for "Forcine Concrete & construction Company, Inc.'s" "Slab on grade works" was December 8, 2022").

75. MS Park further attested that it "has been paid in full" for all "materials and/or services performed services and/or work at or relating to the Property . . . leaving an outstanding balance of the final and total contract amount of $0.00." *Id.* at PNK P1_00004, par. B.

76. Forcine submitted Payment Application #8 to MS Park in the amount of $43,146.14 on November 17, 2022 for the period ending November 30, 2022. DSMOF, Ex. D.

77. Forcine submitted Payment Application #10[2] to MS Park in the amount of $55,031.16 on May 15, 2023. DSMOF, Ex. X.

---

[2] After Forcine filed a Mechanics' Lien against the Property, MS Park paid Forcine $463,515.85, which was the amount that Forcine invoiced for Payment Application No. 9. Accordingly, Forcine is not asserting a claim in connection with Payment Application No. 9. *See* March 17, 2023 letter from Shawn Farrell, Esq., attached hereto as **Exhibit 34;** *see also* Payment Application No. 9 in the amount of $463,515.85, attached as **Exhibit 35.**

78. To date, MS Park has not paid Forcine for Payment Application #8 or Payment Application #10. *See* MS Park's Brief in Support of its Motion for Summary Judgment at 13.

79. Ultimately, MS Park refused to pay Forcine because of alleged deficiencies with the Ductilcrete® slab on grade floor. *See, e.g.*, *id.* at 12-23.

**B. <u>Sale of the Property</u>**

80. On August 8, 2023, PNK P1 entered into a purchase-and-sale agreement (the "PSA") to sell the Property with Patton Hazleton, LLC ("Buyer") for $38,500,000. *See* Purchase and Sale Agreement, attached as **Exhibit 36.**

81. MS Park was not a signatory to the PSA. *Id.*

82. The PSA governs the sale of completed Project to a third-party purchaser. *Id.*

83. As part of the sale transaction, MS Park contends that it agreed to pay the Buyer certain amounts in connection with alleged issues relating to Forcine's work. *See* **Exhibit 37** (MS Park's Answer with Counterclaim), p. 12 at ¶¶ 106-07.

84. The payment at issue was made in connection with the sale transaction *after* the Property was completed and sold. *See* Sharkov Dep. (Ex. 2) at 176:23–177:3.

85. MS Park's Counterclaim alleges that it incurred $212,000 in damages arising from the payment made to the Buyer in connection with the sale of the Property. *See* Ex. 37 (MS Park Answer with Counterclaim), p. 13, ¶ 110.

86. MS Park does not allege that it incurred any repair costs to remediate the concrete work prior to the sale. *Id.*

87. MS Park does not allege that it paid to physically repair or replace Forcine's work prior to the sale of the Property. *Id.*

88. MS Park does not allege that the Subcontract required Forcine to guarantee the resale price of the Property. *See*, *e.g.*, Ex. 37 (MS Park's Counterclaim).

89. The Subcontract does not contain any provision guaranteeing the resale value of the Property. *See* DSMOF, Ex. B (Subcontract).

90. The Subcontract does not contain any provision requiring Forcine to indemnify MS Park for negotiated concessions made in connection with a third-party sale of the Property. *See* DSMOF, Ex. B (Subcontract).

91. The Subcontract does not contain any provision requiring Forcine to compensate MS Park for diminution in value or resale price adjustments in connection with a sale of the Property. *See* DSMOF, Ex. B.

92. The Buyer admitted that this payment was intended to be a seller's credit to the "overall transaction." Lindor Dep. (Ex. 16) at 103:19-104:24, 123:21-124:4; *see also* Draft HUD-1 Settlement Statement dated 10/5/23 attached as **Exhibit 38** (including a $212,000 seller's credit).

93. However, Stiles had a conversation with the Buyer, and told him to "just send me the invoice and we'll handle it that way" because it would be "simpler" for him to deal with it that way. Lindor Dep. (Ex. 16) at 129:12-131:8.

94. Further, after the Buyer submitted the invoice to the Owner, Sharkov's attorney demanded that the invoice be resubmitted with MS Park Construction, LLC as the payee, and the Buyer complied. *See* 10/12/23 Email from Jason Soucy to Thierry Lindor, attached as **Exhibit 39;** Lindor Dep. (Ex. 16) at 143:8-146:7.

95. Sharkov directed MS Park to make this payment to the Buyer **after the sale closed**. *See* Sharkov Dep. (Ex. 2) at 176:23–177:3.

96. Five days before MS Park submitted payment to Buyer, PNK Holdings deposited $300,000.00 into MS Park's account. *See* October 2023 Account Statement for MS Park's Chase Bank Account, a copy of which is attached as **Exhibit 40** (showing a $300,000 deposit via online transfer from PNK Holdings' Account Ending 5915 on October 12, 2023 and the October 17, 2023 wire transfer from MS Park to Buyer in the amount of $212,000).

97. However, MS Park was not a party to the PSA and, therefore, had no obligations to make any payments to Buyer under the PSA. *See* PSA (Ex. 36).

98. Indeed, Buyer initially suggested a seller's credit in the purchase price; however, PNK P1 demanded that the money flow from MS Park. *See* Ex. 38 (October 5, 2023 Draft HUD-1 Statement); *see also* 10/6/23 Email from Joe Hoffman (counsel for PNK) to Samatha Joe (counsel for Buyer) re: Patton Hazleton – Post Closing Agreement for Remedial Work (PNK P1_000452), a copy of which is attached as **Exhibit 41** ("The Seller Credit (208/508) can be removed. MS Park will make payment directly to Patton …").

99. Accordingly, PNK P1 and Buyer entered into a "Settlement of Warranty Claim Regarding Certain Remedial Work" that required MS Park to make the $212,000 payment to the Buyer. A copy of the Settlement of Warranty Claim Regarding Certain Remedial Work (the "Settlement Agreement") is attached as **Exhibit 42.**

100. In the Settlement Agreement, PNK P1 and Buyer claimed that the obligation for *PNK P1* (not MS Park) to remediate alleged defects in the floor installed by Forcine arose out of Section 12(m) of the PSA. *Id.* at p. 1.

101. However, Section 12(m) only applied to *latent* defects (hidden or concealed defects), and the condition of the floor was not a latent at the time of the

PSA; thus, Buyer had no right to any warranty claim under Section 12(m). *See* Lindor Dep. (Ex. 16) at 69:5-71:3; *see also* Ex. 36 (PSA) at § 12(m) ("Improvements on the Property are subject to Seller's warranty obligation for a period of no less than twelve (12) months from the issuance of the certificate of occupancy relating to the Improvements covering any latent defects of the Improvements discovered by Purchaser after Closing to which Purchaser could not have otherwise discovered with reasonable inquiry during the Inspection Period and prior to Closing …").

102. In fact, Buyer stated that at the time of execution of the PSA, the condition of the concrete installed by Forcine was not "latent," was "obvious," and that it was aware of it. *See* Lindor Dep. (Ex. 16) at 70:11-24.

103. Similarly, Rozengaus agreed that the alleged issues with the Project's floor were not latent, but observable. *See* Rozengaus Dep. (Ex. 3) at 205:13-16.

104. Further, even if an obligation did exist under Section 12(m) of the PSA (it did not), PNK P1 could have satisfied its obligation by providing Buyer with the Ductilcrete Warranty for the floors; however, PNK P1 did not provide that warranty to the Buyer. Lindor Dep. (Ex. 16) at 71:4-18; Stiles Dep. (Ex. 10) at 177:12-178:19; Ex. 36 (PSA) at ¶ 12(m) ("Section 12(m) of the PSA provides, in pertinent part: "Instead of fulfillment of warranty obligations under this Section 12 (m), **Seller may at Seller's sole discretion elect to assign any and all warranties held in the name**

**of Seller provided by Seller's general contractor in connection with the construction of the Improvements**.") (emphasis added).

105. In fact, Stiles testified that, without regard for their contractual obligations to the Buyer, PNK Group decided it wanted MS Park to make this payment to, in their opinion, make things right. Stiles Dep. (Ex. 10) at 178:10-13.

### C. PNK Group Did Not Suffer Any Damages Because They Made Their Anticipated Profit on the Project and No Repairs to the Floor Were Necessary.

106. Stiles testified that, despite any alleged defects to the Property caused by Forcine, Stiles and Sharkov received the profit they anticipated on the Property. *See* Stiles Dep. (Ex. 10) at 97:14 – 98:6.

107. Further, the Project did not require any repairs, as evidenced by the fact that the Buyer has not made any repairs to the Property despite their use of the Property for the past several years. *See* Lindor Dep. (Ex. 16) at 98:1-11.

108. A representative of PNK Group, Alena Lazareva ("Ms. Lazareva") also confirmed that the alleged "defects" to the Project's floor did not interfere with the use of the building and was not covered by the warranty in the PSA. *See* email from Ms. Lazareva, which is attached as **Exhibit 43.**

**D. <u>The Individuals Involved in Sharkov's "PNK Group"</u>**

109. Andrey Sharkov ("Sharkov") is a Russian businessman and the owner of the "brand" PNK Group, a fictitious name which operates as a "marketing entity" for the registered businesses under its umbrella. *See* Sharkov Dep. (Ex. 2) at 10:14-11:16, 49:19-50:3.

110. Sharkov owns and operates numerous companies in Russia and in the United States, which fall under his "brand" PNK Group, including Defendants, PNK Holdings, LLC, which is the holding company that Sharkov created to hold his ownership interest in the other US-based entities, MS Park Construction, LLC f/k/a Research, LLC (which Sharkov created to serve as the "contractor" on PNK Group's projects), PNK P1, LLC (a single-purpose entity that Sharkov created to purchase the Property, using his own funds), and A Class Capital (a Russian company that Sharkov owns and utilizes for his Russia-based employees). Sharkov Dep. (Ex. 2) at 9:9-12:11, 28:19-23, 25:17-21, 61:22-63:8.

111. As discussed further below, Sharkov has engaged several people to "help" him with his interconnected web of companies that fall under the PNK Group umbrella, all of which is done to evade liability. Those individuals include:

a. Defendant, Mark Stiles ("Stiles"), his "business partner", who assists with finding new locations for projects, negotiating the purchase and sale of Sharkov's properties, and facilitating the construction process;

b. Park Mun Seong ("Mr. Park"), an electronic salesman from Korea that Sharkov uses as a "straw man" to sign all the companies' documents even though he has no involvement in the operations or management of the company in an effort to evade taxes;

c. Alex Rozengaus ("Rozengaus"), who Sharkov advertises as a "Partner" of PNK Group, but who actually runs his own company, Builderdome Construction, that provides the construction management services for PNK Group's projects, even though Sharkov set up and uses MS Park as the "named" contractor on the Projects; and

d. George Muraviev ("Muraviev"), who Sharkov advertises as PNK Group's "Administrative Director," even though he works for a separate Sharkov-owned entity, A Class Capital.

***Mark Stiles***

112. Stiles is Sharkov's "business partner" in the PNK Group "brand." *See* Stiles Dep. (Ex. 10) at 21:12-22:19; *id.* at 8:1-3.

113. Stiles is a 10% partner with PNK Holdings on all PNK Holdings projects (with Sharkov holding the remaining 90% interest), receiving a share of the profits from the projects managed under the PNK Group umbrella, despite the use of various shell organizations that Sharkov and Stiles create in the United States. Ex. 2 (Sharkov Dep.) at 23:6-11.

114. Stiles receives his 10 percent fee from the proceeds of each property sale. Ex. 10 (Stiles Dep.) at 26:9-27:15.

***Mr. Park***

115. Mr. Park is a resident and citizen of South Korea, living over 6,000 miles from the Project, who has no construction, real estate or corporate management experience; rather, his employment background consists of electronic wholesale positions in the electronic sales industry. *See* Park Dep. (Ex. 8) at 7:12-14, 19:23-24:5.

116. Mr. Park's only income comes from his moderate annual salary of approximately $20,000-$30,000 USD, which he solely receives from his position as an electronic salesman. Park Dep. (Ex. 8) at 25:7-13.

***Rozengaus and Builderdome***

117. Alex Rozengaus ("Rozengaus") is listed as a "Partner" of PNK Group on its website; however, he is not an employee of any entity under the "PNK Group"

umbrella; rather, he owns his own company, Builderdome Construction Corp. ("Builderdome") to provides construction management services for PNK Group projects, including this Project. *See* Rozengaus Dep. (Ex. 3) at 18:12-20:24; *see also* Rozengaus Dep. Ex. 2 (PNK Group website), a copy of which is attached as **Exhibit 44** at 8; Independent Contractor Agreement between PNK P1 and Builderdome, a copy of which is attached as **Exhibit 45.**

118. Indeed, Builderdome was hired to perform all of the essential functions of a contractor on the Project (which was supposed to be Research's job), including:

1) Organizing the construction process in order to build a fully functional class-A warehouse with site improvements and further tenant improvements requested by tenants. All improvements on site should be constructed according to the PNK technology, approved design and code, and should be inspected and approved by the authorities and owner including, but not limited to the receipt of certificates of completion and occupancy.

2) Preparing the schedule and budget of the project, approving both with the Company and managing performance on time and within budget.

3) Managing the construction process from the start to the completion of the project, including but not limited to:

    a. Bidding, negotiating best terms for the company and concluding contracts with:

        i. All Independent Contractors and sub-Independent Contractors necessary to construct improvements mentioned above in #1.

        ii. Suppliers and factories Independent Contractors necessary to construct improvements mentioned above in #1.

iii. Engineers and other consultants and vendors necessary to construct improvements mentioned above in #1.

b. Managing on day-to-day basis the operations of all vendors.

4) Cooperation with authorities, township, and county officials, and any other persons that may be required to participate in the construction of the project.

Ex.45_.

119. In exchange, Builderdome received 5% of the Net Profits from the sale of the Property. *Id.* at 2.

120. Rozengaus confirmed during his deposition that he was the sole owner of Builderdome Construction Corp. and he (not MS Park) served as the construction manager for the Project. Rozengaus Dep. (Ex. 3) at 18:17-21, 43:10-14.

***Muraviev***

121. George Muraviev ("Muraviev") claims on PNK Group's website that he is an "Administrative Director" for PNK Group (Ex. 44 at 9); however, he is not an employee of PNK Holdings or PNK P1, does not receive a salary from either, and is solely employed and paid by a company named "A Class Capital," which is a Russian-based entity that Sharkov created to engage his Russian-based employees to serve as the "back office" for PNK Group's international projects. *See* Deposition Transcript of George Muraveiev ("Muraviev Dep."), relevant portions of which are attached as **Exhibit 46** at 30:13-19; *id.* at 32:13-16; *id.* at 17:19-24:24.

122. However, there is no agreement between A Class Capital and PNK P1 regarding the cost of having Muraviev work on the Project. Ex. 2 (Sharkov Dep.) at 65:3-7.

123. In fact, while Sharkov apparently is no longer the Owner of A Class Capital, A Class Capital continues to pay Muraviev to provide services for Sharkov, even though it does not make any revenue from its dealings with PNK Holdings. Muraviev Dep. (Ex. 46) at 24:13-28:14, 33:16-21.

124. Indeed, over half of his time is spent assisting Sharkov with PNK Holdings' business in the United States, while the other 50 percent of his time is spent assisting Sharkov with his business in Europe. Muraveiev Dep. (Ex. 46) at 35:21-36:12.

125. Muraviev helped Sharkov with organizing the US-based PNK Holdings companies when Sharkov decided to start conducting business in the Unites States. Muraviev Dep. (Ex. 46) at 30:9-19.

126. Muraveiev also assists Sharkov with PNK Group's documents, proposals, contracts, and assisting PNK Group's legal team in red lining, summarizing and presenting to the Sharkov so he can make decisions on how he wants to proceed. Muraviev Dep. (Ex. 46) at 37:6-13.

127. Muraviev had no prior construction experience, besides renovating a house, and his sole expertise is in finance and banking. Muraviev Dep. (Ex. 46) at 11:9-13:4.

128. Mr. Muraviev never visited the Project during its duration and only visited it prior to PNK P1's acquisition of land. Muraviev Dep. (Ex. 46) at 9:13-22.

### E. The Entities Created, Controlled and Dominated by Sharkov and Stiles.

129. Sharkov and Stiles use the brand "PNK Group" to market their many companies. Stiles Dep. (Ex. 10) at 22:16:23:1, 48:9-49:4, 62:12-17; Sharkov Dep. (Ex. 2) at 49:19-50:12.

130. PNK Group is not a company. Sharkov Dep. (Ex. 2) at 50:13-20.

131. However, the only website that Sharkov and Stiles have for their companies is for PNK Group (https://pnk.group/); all of the employees for the Sharkov/Stiles entities have an email with the domain "PNKGroup.com"; and all of the companies use the same logo, name, and advertising materials for their work. Ex. 10 (Stiles Dep.) at 62:18-25; 66:8-19.

132. In fact, Sharkov and Stiles falsely advertise that PNK Group is an "engineering and production company" that serves as an investor, developer, engineer, and general contractor for its projects. *See* Ex. 44.

133. PNK Holdings is an investment holding company created by Sharkov and Stiles in the United States within PNK Group that operates on behalf of single-use entities to negotiate land deals and land purchases. Ex. 2 (Sharkov Dep.) at 10:4-13, 12:1-6, 13:14.

134. PNK Holdings is owned by Defendant, Andrey Sharkov ("Sharkov"), who is the Sole Member with a 100% interest in the company. *See* PNK Holdings' LLC Operating Agreement, attached as **Exhibit 47** at Exhibit "A."

135. However, Mr. Park is the "Manager" of PNK Holdings. *Id.* at p. 2, ¶ 7.

136. Mr. Park was a "Manager" in name only, as he did not have the authority to make any major decision without first obtaining written approval of Sharkov. *Id.* at p. 3, ¶ 9; *see also* Park Dep. (Ex. 8) at 66:17-23 (testifying that with respect to PNK Holdings, his only role was to sign what he was asked to sign).

137. Generally, as a practice within its corporate structure, with regard to land deal for investments, PNK Holdings participates in the initial negotiations related to the land deals and then, once a negotiation is successful, PNK Holdings registers a new single-use company to make the purchase, at which point PNK Holdings invests its funds into the new company. Ex. 2 (Sharkov Dep.) at 13:12-16

138. With respect to this Project, once Sharkov and Stiles found the parcel of land to purchase for the Project, Sharkov opened PNK P1 for the sole purpose of

purchasing the land. Ex. 2 (Sharkov Dep.) at 15:11-16:12; Ex. 10 (Stiles Dep.) at 103:12-104:7.

139. PNK Holdings is the sole member of PNK P1. *See* Operating Agreement of PNK P1 LLC, a copy of which is attached as **Exhibit 48.**

140. PNK Holdings invested the capital into PNK P1 for the purchase of the Property by transferring funds directly from the PNK Holdings bank account to a bank account owned by PNK P1. Sharkov Dep. (Ex. 2) 13:14, 53:3-9, 55:3-16.

141. According to the Operating Agreement, Mr. Park was the manager of PNK P1. Ex. 48 at § 4.1.

142. However, Mr. Park was the manager of PNK P1 in name only, as all he was asked to do was sign documents on behalf of PNK P1 by Sharkov. Park Dep. (Ex. 8) at 106:11-16, 32:22-33:24.

143. Sharkov admitted that he set up this scheme to avoid paying Russian taxes, which is a "cumbersome" administrative process when a Russian citizen owns and operates a business outside of Russia. Sharkov Dep. (Ex. 2) at 34:17-36:12.

144. On November 15, 2022, the Operating Agreement of PNK P1 was amended whereby PNK Holdings was identified as the "Founding Member" of the company, with Stiles identified as a "Profit Interest Member," whereby Stiles

received a 10% non-voting, non-capital interest in PNK P1 for providing the following services:

a. Facilitation of construction process, including but not limited to, engagement of and supervision of contractors in connection with the construction of the Project; cooperating with authorities, township, and county officials, and any other persons that may be required to participate in the construction of the Project.

b. Rental of the Project to a qualified tenant;

c. Sale of the Project to a qualified purchaser.

*See* First Amended and Restated Operating Agreement for PNK P1, a copy of which is attached as **Exhibit 49** at p. 11, Schedule A

145. In exchange for his 10% profit interest, Stiles was expected to communicate with clients and brokers, perform all duties related to the contracts for the Project, sell the building, assist in searching for the Property, participating in deal negotiations, and participating in the entire process related to the deal. Sharkov Dep. (Ex. 2) at 26:13-27:4.

146. Even though Mr. Park did not manage the company in any way, he was still listed as the manager of PNK P1 in the First Amended and Restated Operating Agreement. Ex. 49 at p. 5, § 4.1.

147. PNK P1 entered into a contract with Research LLC (the predecessor of MS Park) to serve as the Contractor for the Project. DSMOF, Ex. A.

148. The Prime Contract was signed by Mr. Park (on behalf of PNK P1) and Rozengaus (on behalf of Research); however, Mr. Park signed a Resolution as the Manager of Research LLC that provided Rozengaus with the authority to sign the Prime Contract; therefore, Mr. Park essentially signed the Contract as both the Owner and Contractor, at the direction of Sharkov, without any knowledge or interest as to what he was doing. *Id.*; *see also* Park Dep. (Ex. 8) at 32:11-35:5.

149. Meanwhile, Mr. Park signed the Subcontract with Forcine on behalf of Research. DSMOF, Ex. B.

150. PNK Holdings is identified as the "sole member" of Research. *See* First Amendment to Limited Liability Agreement of Research, LLC, a copy of which is attached as **Exhibit 50.**

151. Mr. Park is identified as the "President" and "Sole Manager" of Research, LLC; however, he did not manage the company in any way and only signed documents at the results of Sharkov. *Id.*; *see also* Action by Written Consent of Sole Manager of Research, LLC, a copy of which is attached as **Exhibit 51**; Ex. 8 (Park Dep.) at 27:1-28:20; Rozengaus Dep. (Ex. 3) at 67:10-23 (testifying that Mr. Park never attended project meetings, engaged in conversations related to the Project, had no day-to-day involvement, never visited the project site, and had no involvement in dealing with subcontractors); Park Dep. (Ex. 8) at 30:21-33:9

(testifying that he did not even read the documents he was requested to sign and signed them without knowing the context behind the documents).

152. Research ultimately changed its name to MS Park. Ex. 2 (Sharkov Dep.) at 109:18-23.

153. Again, even though he has no involvement in the operation of the company, Mr. Park is the "Manager" of MS Park, while PNK Holdings is the Sole Voting Member of MS Park. *See* Ex. 51**.**

154. Thus, both the contractor (Research/MS Park) and the Owner of the Property (PNK P1) are wholly owned subsidiaries of PNK Holdings and controlled by Sharkov, through the "straw man," Mr. Park. *See* Ex. 1 at p. 7.

155. Sharkov knew "everything" about the Project and made all decisions relating to the Project. *See*, *e.g.*, Stiles Dep. (Ex. 10) at 116:18-25 (testifying that Sharkov is the only one who made the decision to purchase the project); Rozengaus Dep. (Ex. 3) at 24:11-15 (testifying that Sharkov was the only person in charge of PNK Holdings and MS Park); *id.* at 69:15-19 (testifying that Sharkov made the decision to install a seven inch Ductilcrete slab); Muraviev Dep. (Ex. 46) at 46:22-48:7 (testifying that Sharkov made the decision to use Mr. Park as the signatory for the companies involved with the Project); *id.* at 55:9-17 (testifying that Sharkov decided the contract sum between PNK P1 and Research LLC for the Project); *id.* at

62:10-63:3 (testifying that Sharkov would know what accounts the money came from to issue payments for the work performed on the Project); *id.* at 71:22-72:5 (testifying that Sharkov made the decision to run the contract with Forcine with Research and not PNK); *id.* at 81:6-21 (testifying that Rozengaus would have been required to bring information related to the flooring system to Sharkov for approval); Sharkov Dep. (Ex. 2) at 42:4-14.

156. PNK Holdings, through Sharkov and Stiles, engaged Mr. Park, who had no involvement in the Project, to act as the signatory for MS Park as the general contractor for the Project and for PNK P1, as the Owner of the Project, in an effort avoid taxes in Russia. Ex. 2 (Sharkov Dep.) at 34:6-36:12; ("Q. Why do you need Mr. Parks' involvement at all to sign the documents? A. I believe that I have already explained that at the time that I was a Russian subject, a Russian citizen, if a company has a company outside Russia, a foreign company has a manager from Russia, then the company must pay taxes in Russia, must be considered a Russian taxpayer."); *see also* Ex. 8 (Park Dep.) at 106:5-107:3 (testifying that the only thing he did in connection with the sale of the property was "sign" and that he had never heard of the purchaser, and received no money from the sale of the property); *id.* at 104:10-14 ("Q. Are you someone who just signs documents when they are sent to you, or did you have a more active role in the construction project? A. **I only sign.**

**That's all**."); *id.* at 27:1-28:17 (testifying that while he is the director of Research LLC, Sharkov was the Owner, and Sharkov would send him documents to sign and he would sign and send them over, but he had no other role and did not receive any compensation for his services).

157. Sharkov, through PNK Holdings, invested all of the capital into PNK P1 for the purchase of the Property. Ex. 2 (Sharkov Dep.) at 13:12-14:18, 26:4-12.

158. Sharkov, through PNK Holdings, invested all of the capital into MS Park. Ex. 2 (Sharkov Dep.) at 120:18-121:14; Ex. 1 at p. 33 (providing that all of the equity in the company came from "Owner's Investment PNK HOLDINGS, LLC").

159. Sharkov directed funds through the entities without regard for the respective obligations and roles of each company. *See* Sharkov Dep. (Ex. 2) at 123:16-19 (Q. "How was MS Park paid, paid monthly or quarterly or half in the front and half in the back? How was it paid? A. As needed. There was no system to it."); *id.* at 55:6-16 (testifying that the money for the purchase of the property "could have been either from the holding company [PNK Holding] or from PNK P1.").

160. By way of example, in some instances, PNK Holdings made payments directly to Research's subcontractors. *See* Wire Transfers from PNK Holdings AE 0372 to J&R Slaw, Inc., a copy of which is attached as **Exhibit 52.**

161. In fact, PNK P1, who hired MS Park and agreed to pay it for the construction of the project, did not pay MS Park for construction; rather, PNK Holdings simply invested money in MS Park for the purchase of various types of equipment. Sharkov Dep. (Ex. 2) at 120:7-121:14.

162. PNK Holdings has no employees, and everyone who works for "PNK Group" in the United States is an employee of MS Park. Sharkov Dep. (Ex. 2) at 21:12-15.

163. MS Park lacks its own basic formalities, such as minutes/records of meetings, annual reports, financial statements, profit and loss statements, pro formas, investment proposals, project budgets, financial models, cash flow projections, docketing statements and beneficial ownership information reports, corporate disclosures of filings under the Corporate Transparency Act, and corporate governance documents. *See* Verification of George Muraviev, a copy of which is attached as **Exhibit 53.** Indeed, Sharkov testified that the "tax-paying" entity for the companies is ultimately PNK Holdings. Sharkov Dep. (Ex. 2) at 120:7-10.

164. MS Park had no physical office, no construction staff, and no operational capital besides what PNK Holdings funneled to it. Sharkov Dep. (Ex. 2) at 133:22-134:1.

165. Indeed, at the time of the execution of the Subcontract, MS Park had no employees. *See, e.g.*, MS Park's Form 941 Statement for Quarter 1 of 2022, a copy of which is attached as **Exhibit 54.**

166. The construction management duties were contracted out to third parties, at the instruction of Alexander Rozengaus, demonstrating that MS Park had no internal capacity to perform those services. Sharkov Dep. (Ex. 2) at 131:22-132:18; *see also* Ex. 45 (Builderdome Independent Contractor Agreement).

Respectfully submitted,

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

**Date:** July 24, 2026

**BY**: *\/s/ Shawn R. Farrell*

**SHAWN R. FARRELL, ESQUIRE**
**JOSEPH L. SINE, ESQUIRE**
PA Identification Nos. 76738/318473
1600 Market Street, 32nd Floor
Philadelphia, Pennsylvania 19103
Tel.: (215) 564-1700
Emails: sfarrell@cohenseglias.com
jsine@cohenseglias.com
*Attorneys for Plaintiff,*
*Forcine Concrete & Construction Company*