# EXHIBIT 46

. -

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FORCINE CONCRETE & : NO. 3:23-cv-02024-SES
CONSTRUCTION COMPANY, :
:
Plaintiff :
:
vs. :
:
MS PARK CONSTRUCTION, LLC, :
F/k/a RESEARCH, LLC, :
:
Defendant :
-----------------------------

ZOOM VIDEOTAPED DEPOSITION OF GEORGE MURAVIEV

Taken via Zoom on Wednesday, January 15, 2025, commencing at 7:55 a.m., by Stacy D. Serba, Notary Public.

APPEARANCES:

COHEN, SEGLIAS, PALLAS,
GREENHALL & FURMAN, PC
BY: SHAWN R. FARRELL, ESQ.
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
215.564.1700
Sfarrell@cohenseglias.com
-- For the Plaintiff

HORN WILLIAMSON, LLC
BY: THOMAS P. STEVENS, ESQ.
2 Penn Center, Suite 1700
1500 JFK Boulevard
Philadelphia, PA 19102
215.987.3800
Tstevens@hornwilliamson.com
-- For the Defendant

ALSO PRESENT: Denis Korolev, Esquire
Robert Morison, MLV Technician
Elana Pick, Russian Interpreter
Jason Dugmore, Videographer

A. Right.
Q. Okay. So during the construction of this project, did you also live in Moscow or did you live in the United States?
A. No. I live in Moscow.
Q. Okay. How often would you come to Pennsylvania to visit the project?
A. I think I was there once.
Q. Okay.
A. Yeah, once.
Q. Some of my questions will test your memory. If you don't know, just let me know.
But do you recall when you visited the project?
A. It was somewhere in '21, actually, when we purchased the land.
Q. So it was before the start of physical construction?
A. Yeah.
Q. Okay. So during construction, you never were physically present?
A. Nope.
Q. Okay. What -- what involvement did you have? Did you Zoom in? Did you call people? What

Q. Okay. When did you graduate from college with these degrees?
A. The first one, the bachelor was 2008. And the second one, 2010.
Q. Is the second one another bachelor degree or is it master's degree, like a higher --
A. It's a master's. Yes, it's a master's degree.
Q. Okay. So when you get out of school in 2010, who did you go and work for?
A. I started working in 2006, actually, in the banking industry.
Q. What was the name of the bank that you worked for?
A. Well, there were many of them. I can name them, but they are in Russia, I mean. If you need, I can name.
Q. Well, maybe you can just describe for me, what do you mean by the banking industry? Did you work for a particular bank or did --
A. Yes.
Q. Okay. And you worked for several banks?
A. Several banks, yeah. I changed several places of work during, you know, this period of time.

Q. Okay. And -- and what was your title?
A. I was the manager for strategic planning.
Q. And what does that mean?
A. Well, actually that's mean that, you know, together with the shareholder, I created the strategy, the long-term strategy and the short-term strategy for the development of the bank.
Q. You mean that you would determine what types of loans you would make and the interest rates that you would charge?
A. Yeah. Just which branches to open, which regions to enter or lose, which -- I don't know, different unique projects we need or whatever else. Yeah, something like that.
Q. Okay. And how long were you in the banking industry?
A. I was in the banking industry until I joined PNK, actually, in -- which was 2017.
Q. Okay. And prior to joining PNK, did you have any construction experience from an employment setting?
A. I would say no. But I have a construction experience investing in a residential house in the United States in Ohio, actually.

Q. Tell me about that project.
A. Myself and my partner, we purchased a house. And the purpose of that was, like, a classic flip, so to say.
Q. Okay. How did you, sitting in Moscow, learn of a house in Ohio?
A. Well, I, you know, passed several courses and studied a little bit. So that's how. Then I came to the United States for, like, four or five months, so --
Q. Who was your partner in that residential project?
A. It's a friend of mine.
Q. What was that friend's name?
A. It's Alexey Obynnih.
Q. We may need some help with spelling on that one.
A. Well, Alex, you may call him Alex.
Q. Okay.
Q. What was his last name?
A. O-B-Y, double N, I guess I-H. Something like that.
Q. Okay. And did Alex have any experience in construction?

responsibilities within A-Class Capital?
A. As I already told, I'm the administrator and advisor for -- for the owner of PNK.
Q. I guess I'm hoping you can describe a little bit more of what activities on a day-to-day basis you would do as an advisor to the owner.
A. Okay. So I'm looking in to, you know, the proposals and contracts which we receive; engaging the legal counsels; and summarizing, providing red line from those legal counsels; presenting the stuff to the owner, having him, you know, decide what he wants to do next. And then making that happen.
Q. Do you have any ownership stake in A-Class Capital?
A. No, I don't.
Q. Do you provide any financial advice to the owner of A-Class Capital?
A. No, I don't.
Q. What is the business of A-Class Capital? What does it do?
A. As I told you, it's a back office for the international projects.
Q. Okay. I guess I'm inartfully asking, what type of projects does A-Class Capital do? Does it --

A. Oh, it --
Q. Does it -- does it do financial investments like an angel financing in the medical industry or in on the construction industry or in any other industry?
A. No. It's an industrial developer.
Q. Industrial developer. What -- what -- what does that mean?
A. Well, that means that we build projects in the United States, in Europe, industrial projects.
Q. So you build industrial commercial spaces worldwide?
A. Right.
Q. Warehouses, office buildings, things of that nature?
A. Please repeat. What --
Q. I was trying to get an idea of what types of industrial structures that you -- you are involved with. And I was saying warehouses, office buildings, that type of work?
A. No office buildings, only industrial.
Q. And by industrial, warehouse would be an industrial structure, right?
A. Yes. Warehouses, distribution centers.

Well, manufacturing facilities.
Q. Okay. How large of a company is A-Class Capital?
A. It's not that big. I don't recall exactly how many people, but, maybe 50, something like that.
Q. Fifty people?
A. Uh-huh.
Q. What's the hierarchy of A-Class Capital? Obviously, Sharkov is at the top and then where does everyone else fall? Where do you fall?
A. We have the financial director. We have some accounting team, legal team.
Q. Okay. Let me start a different way. Who do you report to?
A. To the owner.
Q. Only to the owner?
A. Yes.
Q. Okay. Who reports to you?
A. Lawyers.
Q. Okay.
A. And, you know, some assistants.
Q. How about the financial director?
A. He does not.
Q. Do you help evaluate whether or not any

particular project is worthwhile as an investment or do you just assist Mr. Sharkov with understanding the agreements that are presented?

A. I only assist. I do not give the financial advice or the evaluation.

Q. Okay. How many warehouse projects has A-Class Capital been involved with in the United States?

A. Right now, I think it's up to ten. It might be less or more. But something like that.

Q. Are all the projects in Pennsylvania?

A. No.

Q. This project that we're here about in Hazle Township, was that the first project that A-Class Capital was involved with in the United States or were there others before that?

A. There were others.

Q. How many others?

A. Let me see. Three others.

Q. Where are those projects?

A. Two in Georgia. Well, actually three in Georgia, yeah. Three in Georgia.

Q. In what years were the projects in Georgia built?

A. It was '18 and '19. And then '20 or '21.
Q. Okay. Were those projects of a similar size and cost as the project in Pennsylvania?
A. Two of them, yes. The third one was, like, three times bigger.
Q. What's the -- can you name these projects for me? Did they go by a certain name or can you tell me the location of them?
A. Yeah, I can tell you the location. So the first one was Savannah. It's actually the city in Georgia. And the two others were from McDonough, Georgia. It's near Atlanta.
Q. Okay.
MR. STEVENS: And forgive me, did you say Maradonna?
THE WITNESS: McDonough.
Q. Markdonna, like M-A-R-K-D-O-N?
A. M-C-D-O-U.
Q. Can you spell that one more time? I'm sorry. There was a connection problem.
A. M-C --
Q. Uh-huh.
A. D-O-U-N-O-H. Something like that.
Q. Got you.

MR. STEVENS: Thank you.
Q. So two of the projects were in McDonough, Georgia, right?
A. Yes.
Q. Where was the largest of those three projects? You said one was much larger than the other two.
A. In McDonough.
Q. Okay. They were all three warehouses, correct?
A. No. They were regular tilt-up warehouses.
Q. What do you mean by regular tilt-up warehouses?
A. You mentioned the prior. I thought it was pre-cast. So they were not pre-cast.
Q. The ones in Georgia were not pre-cast projects, correct?
A. No.
Q. Okay. The project in PA was -- was not a pre-cast project, was it?
A. Which one? The Humboldt?
Q. Yeah.
A. It was pre-cast.
Q. So I want to talk about the Pennsylvania

project for a little bit. When did you first learn of the Pennsylvania project?
A. Please specify, what do you mean?
Q. How did you come to decide that you're going to build a warehouse project in Pennsylvania?
A. Well, I don't recall exactly. But I think that there was a site introduced by a broker to us and that's how we, like -- after some time decided to buy it.
Q. Okay. What -- what's the broker's name?
A. I don't recall.
Q. Is this the same broker that introduced you to the project in Georgia?
A. No. I doubt.
Q. I guess I'm -- I'm curious as to how you learn of projects in the United States from Moscow.
A. Well, we obviously have people in the United States. We have an office in the -- in New York, so.
Q. Okay. So tell me about the United States' arm of A-Class Capital.
A. It's not an arm, so to say. It's PNK brand.
So what exactly you want to hear?
Q. How many offices do -- well, first off, I'm not clear what you mean by brand. The company that

pays the paycheck to an individual in the United States, is that company named PNK or is that company named A-Class Capital?

A. No. It's not A-Class Capital and it's not PNK. Actually, it is PNK Holdings. So this is the holding company.

Q. Okay. And who owns PNK Holdings?

A. The owner owns it, Mr. Sharkov.

Q. Okay. So just from a corporate structure, I'm wondering, does A-Class Capital own PNK Holdings or is it just that it has the common ownership, these two companies, of Mr. Sharkov?

A. Well, actually, Mr. Sharkov owns PNK Holdings and he quit owning A-Class Capital as of today. So, like, this is it.

Q. Okay. So Mr. Sharkov owns PNK Holdings, but no longer as of today owns A-Class Capital?

A. Right.

Q. Who owns A-Class Capital as of today?

A. I don't know, to be honest.

Q. You work for A-Class Capital, correct?

A. Right.

Q. Is it still in operation?

A. Yes.

Q. Do you know why Mr. Sharkov sold his position in A-Class Capital?
A. I don't know.
Q. How do you know that he no longer owns A-Class Capital?
A. Because he left Russia. He's no longer here.
Q. Just because he left Russia, does that mean he doesn't own A-Class Capital?
A. Yeah. But meaning left Russia, he sold the activities here.
Q. When's the last time you talked to Mr. Sharkov?
A. I think a couple days ago.
Q. And what did you discuss?
MR. STEVENS: Object to the form of the question.
You may answer. Go ahead, George.
THE WITNESS: Should answer or not?
MR. STEVENS: Yes, you may answer.
THE WITNESS: Yeah, we discussed some -- some other project.
BY MR. FARRELL:
Q. Did you, in part, discuss his ownership of

A-Class Capital?
A. No. This is something above me. I'm not discussing such type of things.
Q. Did you discuss whether or not your own employment was at risk?
A. No.
Q. But he told you that he sold his interest in A-Class Capital?
A. No, he didn't told me this directly. But I heard about it.
Q. Do you know where Mr. Sharkov moved to?
A. No.
Q. Do you still -- so I'm trying to understand this. Now that Mr. Sharkov is no longer with A-Class Capital, do you have any business dealings with PNK Holdings in the United States?
A. No. I work for A-Class Capital. I don't have any business dealings with PNK Holdings.
Q. So as of today, you'll have no future involvement with PNK Holdings. Is that correct?
A. No. This is not correct.
Q. Okay. Do you still work with PNK Holdings?
A. I still work with the shareholder with regard to his international business, which is the

United States and then Europe.
Q. And by shareholder, you mean Mr. Sharkov, right?
A. Correct.
Q. So is Mr. Sharkov going to pay you for your services in assisting him with PNK Holdings?
A. I'm getting paid via A-Class Capital here in Russia.
Q. So your paycheck comes from A-Class Capital, but you will work for PNK Holdings?
A. I am not working for PNK Holdings. As I told you, I'm working for the owner.
Q. Mr. Sharkov?
A. Right.
Q. So is Mr. Sharkov going to pay you for your services when you're working with PNK Holdings?
A. Again, as I told you, I'm getting paid via A-Class Capital.
Q. I -- and I don't mean to be obtuse about this, I'm just not following that. A-Class Capital is paying you to work for it to provide services to A-Class Capital, correct?
A. To provide services for the shareholder.
Q. Of A-Class Capital?

A. No. To Mr. Sharkov.
Q. So A-Class Capital is paying you to provide services to Mr. Sharkov?
A. Right.
Q. Even though Mr. Sharkov no longer is a shareholder of A-Class Capital?
A. Yes.
Q. Why would A-Class Capital pay you to provide services to an owner of a different company?
MR. STEVENS: I object to the form of the question.
You may answer.
A. Well, I don't know why. They just pay me and I'm good.
Q. Does A-Class Capital charge Mr. Sharkov for its services?
A. I don't know.
Q. Do you have any ownership interest in PNK Holdings?
A. No, I don't.
Q. Did you have any ownership interest in the property in Pennsylvania?
A. No, I don't.
Q. Never did?

Q. Any employees of PNK Holdings that you're aware of.
A. Well, up to 200.
Q. PNK Holdings has 200 people in its New York office?
A. No. PNK Holdings owns two factories; PNK Holdings owns a GC, which is Research or MS Park; and together in this group, there are 200 people.
Q. When you started working for A-Class Capital back in 2017, was PNK Holdings operating in the United States?
A. No, it wasn't.
Q. Did you help with the formation of PNK Holdings in the United States?
A. I organized -- well, helped and assist to the owner to organize that.
Q. And what did you do to help and assist?
A. Contacted the lawyers, summarized the information and finally we get formed.
Q. Did you start the entity in New York or a different state?
A. No. A different state.
Q. Delaware?
A. If you're talking about PNK Holdings, yes.

A. He is communicating with all the brokers, clients and the -- you know, some -- how you call them -- governmental, meaning, like counties, administrations and all that stuff.
Q. On the website of PNK, it's called PNK Group and there's a page on the website, I'm sure you're familiar with, that has a picture of Mr. Mark Stiles, Alex Rozengaus and yourself, correct?
A. Right. Correct.
Q. You're identified as the administrative director for PNK Group, correct?
A. Right.
Q. Okay. But is it also correct that your salary and the money that you receive for your services all come from A-Class Capital, correct?
A. Correct.
Q. And they always have come from A-Class Capital, correct?
A. Correct.
Q. Okay. And PNK Group is not a separate company, it's just a brand. Is that correct?
A. PNK Group is a brand, yes.
Q. Okay. The actual company's called PNK Holding, correct?

A. Right.
Q. Okay. And Mr. Stiles is located in Atlanta, Georgia, and always has been, correct?
A. Right.
Q. And how about Alex Rozengaus, where is he located?
A. In New York.
Q. In New York. And the roles and responsibilities of Mr. Stiles are to find projects that might be of interest for investment, correct?
A. Yes. Yes.
Q. Okay. Interest for investment for PNK Holdings or interest for investments of A-Class Capital?
A. PNK Holdings.
Q. Okay. But you're currently sitting here today not able to tell me whether or not A-Class Capital makes any money from the dealings with PNK Holdings, correct?
A. Yes. I don't know what are their relationships.
Q. All you know is that you're directed to support PNK Holdings in the United States, correct?
A. Yes. And the -- the other part of business

Q. Okay. I'm confused by the statement that you're the administrative director for PNK Group. I thought that was just a brand name, not an actual company that has been organized and certified as an operating company.

So let me ask you. Is PNK Group a company or is it just a brand doing business as name?

A. Correct. It's a brand doing business as.

Q. But the actually company is PNK Holding?

A. Right.

Q. So you're the administrative director of PNK Holding, really, right?

A. No. Because I don't have any position in there. I'm not physically employed by PNK Holdings.

Q. You're not physically employed by PNK Group, either, correct?

A. Yeah. Because PNK Group is a brand.

Q. You're only employed by A-Class Capital, correct?

A. Yeah.

Q. And now that Mr. Sharkov no longer is the shareholder of A-Class Capital, does that mean that you will still support PNK Group and/or PNK Holdings?

A. That means that I will still support the

shareholder as directed by him.
Q. Who is the shareholder?
A. Mr. Sharkov. The shareholder of PNK Holdings.
Q. You believe that A-Class Capital still wants you to support PNK Holding? Yes?
A. I don't know.
Q. What percentage of your time -- of your time as an employee of A-Class Capital is spent assisting PNK Holding?
A. I think 50/50. Fifty for Europe and 50 for the US.
Q. And are you salaried or hourly employee?
A. Salary.
Q. Full-time employment in Moscow is 40 hours a week?
A. Yes. Something like that. Sometimes more.
Q. Sure. That's -- that's the down side of being a salaried employee.
And you only work for A-Class Capital, correct?
A. I am legally employed for A-Class Capital, correct.
Q. So what on a daily basis do you do for PNK

Group, slash, Holdings?

MR. STEVENS: Objection to the form of the question.

You may answer.

A. Please repeat the question.

Q. What do you do for PNK Group on a daily basis?

A. As I already mentioned, I receive some documents, some proposals, contracts, whatever else, from our US team, from the shareholder and just organize working with the legal team, red lining, summarizing and presenting to the shareholder so he can make his decisions how he wants to proceed.

Q. Okay.

MR. STEVENS: Shawn, I ask you if you let us know when would be a good time to take a five minute break.

MR. FARRELL: Now is the good time.

MR. STEVENS: Thank you.

MR. FARRELL: So just -- George, just so you understand and moving forward, if you ever want to take a comfort break to get a glass of water or do anything else, just let me know and we can halt the deposition. All right?

was?
A. No.
Q. Was it the intent, like your house in Ohio, to always buy, construct and sell the project, the warehouse or was there some other investment strategy?
A. Buy, construct, lease and sell. So we're not selling empty buildings.
Q. And do you recall ever seeing any financials on what the cost of each one of those levels would be, purchase, to construct and then what income would come in from a lease and/or sale?
A. No. I haven't seen that.
Q. But it is your job to take all these financial documents and legal documents from the various people, attorneys and brokers and explain them to Mr. Sharkov, correct?
MR. STEVENS: I object to the form of the question.
You may answer.
A. Not financial. Legal, yes.
Q. So you do not explain any of the legal -- I'm sorry -- you don't explain any of the financial benefits of a project, you just explain the legal.

know that he's existing. I don't know him personally. I never met him.

Q. Have you ever spoken to him?

A. No. Only the shareholder has the direct communication with him.

Q. You said he was involved since 2017. What's he involved in?

A. He's the signator person. So when we created our first entity, which was actually done prior to myself joining the team, and this entity was in Georgia. So he was there as a manager who executes -- who has the right to execute documents.

Q. Has the authority to sign documents on whose behalf, what company?

A. This first company was a Georgia company, which is PNK S2.

MR. STEVENS: Forgive me, did you say S, as in Sam, 2?

THE WITNESS: S2, Sam, yes.

MR. STEVENS: Thank you.

BY MR. FARRELL:

Q. It may get confusing with all the PNK names, but PNK P1, LLC, the original owner of the property in Pennsylvania --

A. Right.
Q. -- that was a single purpose entity, correct?
A. Yes.
Q. And by that I mean, it only had one asset that it owned and that was the land, correct?
A. Yes.
Q. And was -- and you're telling me that Mr. Park was a -- I think you described him as a signatory for PNK P1, LLC. Is that correct?
A. Yes. You saw his signature on all the documents.
Q. Okay. Yeah. We'll look at that in a moment. I'm not -- I'm not taking anything from you. We'll look at his signature quite a bit.
I'm just trying to understand why he's necessary to be the signatory. You've got PNK Holdings in the United States, you got Mr. Stiles, you got Mr. Rozengaus, you've got 200 employees, and yet you have an individual in Korea making $20,000 a year as the signatory for all these companies. I want you to explain to me why.
A. I don't know whether he's making anything. And as I already told, I don't know why he's the

signator. It's the decision of -- of the owner, so.

Q. You never questioned why that was necessary?

A. No.

Q. Who told you it was necessary?

A. The owner.

Q. Mr. Sharkov?

A. Yes.

Q. Earlier you mentioned a company named Research. You're familiar with this company?

A. Yes. This is the name of MS Park Construction, which is now, like -- the former name of MS Park Construction.

Q. The former name, right.

MR. FARRELL: So why don't we put up on the screen -- we'll make this Exhibit 1 -- the Research owner GC prime contract. It's Exhibit 1.

So, Tom, just like the last deposition, I've provided the court reporter with a list of documents. They're pre-marked, so they might have a different number when I'm getting the court reporter to put them up on the screen. Okay?

That's not Exhibit 1.

MR. STEVENS: Shawn, I would simply ask that once you put it up, if you identify the

A. Mr. Sharkov owns PNK Holdings and PNK Holdings is a group of -- like a holding company and owns P1 and Research, LLC, which is now MS Park Construction.

Q. And part of your job back in 2020 was to put together these legal documents and explain them to Mr. Sharkov, correct?

A. Right.

Q. Okay. Then who's deciding the contract sum that's going to be paid between PNK P1 and Research, LLC?

A. Mr. Sharkov, the owner.

Q. And you had no discussions with it, you were just a scrivener, you just made sure that the document said what Mr. Sharkov told you it should say. Is that your testimony?

A. Right.

Q. And you don't know why Mr. Sharkov structured this to have Research, LLC, involved in this project, correct?

A. Well, I can tell you a little story.

Q. Okay.

A. Which is, as I already told you, our first three projects were standard tilt-up buildings, which

whether we pay it or not and we pay it.
Q. Who interfaces -- was there a bank involved in this construction?
A. You mean bank, like, what, financing?
Q. Yeah. Was there a construction loan taken out --
A. No.
Q. -- to build this project?
A. No.
Q. So when you would say to Mr. Sharkov, here's a payment application from Research, they want to get paid, where is the money coming from to pay them?
A. From PNK P1.
Q. The money's coming from PNK P1?
A. Yes.
Q. How does PNK P1 have any money?
A. I don't know. I'm not in charge of the financial, you know.
Q. Does A-Class Capital pay the money?
A. No.
Q. Does PNK Holdings pay the money?
A. Maybe. But I don't know for sure.
Q. Who would know?
A. I know -- the owner.

Q. In 2021, the entity receiving proposals for the scope of work that will become Forcine's subcontract is PNK Group, which we know to be owned by PNK Holdings, correct?
A. No. Because PNK Group is not an entity, as we discussed earlier.
Q. I'm just -- for purposes of this -- for my questions, I'm just going to call it PNK. Let's not worry about whether or not it's Holdings or Group. Okay?
Mr. Rozengaus is representing to Forcine that he wants a proposal for Forcine's scope of work on this project and he's doing that under PNK, right?
A. Maybe. I don't know. If yes, so what?
Q. Not Research, correct?
A. Since PNK owns the Research, I don't see the difference.
Q. Did you ever ask Mr. Rozengaus why he would represent that PNK is soliciting proposals from Forcine as opposed to Research?
A. No, I haven't.
Q. Do you know why, when the contract gets done between Forcine for this project, it's done with Research and not PNK?

A. Because Research is the general contractor and PNK is not.
Q. And Mr. Sharkov told you to structure it that way. Is that correct?
A. Yes.
Q. And you don't know why?
A. Absolutely, yeah.
Q. Okay.
MR. FARRELL: If you can turn to Page 6 of 9, Bates number 4695.
Q. We see that there are other exclusions by Forcine for its scope of work. Do you see that section?
A. Yeah, I see that.
Q. And it's excluding winter concrete, hot water, accelerators, blankets, snow removal, et cetera. Do you see that?
A. Yep, I see that.
Q. Did you see that in 2021?
A. I don't know. I don't recall.
Q. What's that mean to you that they're taking an exclusion to winter concrete?
A. Well, it means exactly what it says here.
Q. What's your understanding of what it says

Do you see that?

A. Yes.

Q. So Forcine identified cracks as an inherent risk of a concrete flooring system, correct?

A. I don't know. Maybe.

Q. Did Mr. Rozengaus ever discuss with you that cracks are an inherent risk of a flooring system?

A. No. I don't recall discussing that with him.

Q. Would you have expected him to bring this to your attention?

A. I don't know. I can't say for Mr. Rozengaus.

Q. Did Mr. Rozengaus have the authority to accept the terms and conditions of a flooring system or did he have to explain everything to you so that you could explain to Mr. Sharkov for approval?

A. He would need to explain myself or go directly to Mr. Sharkov. So the communication works either way. And, yes, he first needs to explain everything and then he can accept or not accept.

Q. But Mr. Rozengaus, to your recollection, never discussed with you this proposal?

A. No.